# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TRAVIS GABRIEL HISEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:04-0924** |
| | ) | **Judge Echols** |
| **CITY OF CLARKSVILLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an employment discrimination action in which Plaintiff, Travis Gabriel Hisel ("Hisel"), has filed numerous grievances and several Equal Employment Opportunity Commission ("EEOC") charges against the Clarksville Police Department. Defendant City of Clarksville has filed a Motion for Summary Judgment (Docket Entry No. 59),[1] which has been fully briefed by the parties.

Also pending are assorted and wide-ranging Motions in Limine (Docket Entry Nos. 76, 78, 79 & 97) which were filed without the benefit of the ruling herein limiting the issues to be tried in this case. Accordingly, the Court will strike those Motions, although the parties will be allowed to resubmit Motions in Limine which take into account the present ruling on the Motion for Summary Judgment.

---

[1]The Motion for Summary Judgment prompted the filing of two additional motions, Defendant's Motion to Allow Filing of Supplemental Affidavit of Richard Stadler (Docket Entry No. 75) and Plaintiff's Motion to Allow Supplemental Responses to Statement of Undisputed Facts (Docket Entry No. 80). Both motions address housekeeping matters – the submission of an affidavit to establish that documents submitted by the Defendant in support of its Motion for Summary Judgment were kept in the normal course of business, and a request by Plaintiff to respond to ten statements of fact he neglected to address in his initial response. Both motions will be granted.

1

# I. __FACTUAL BACKGROUND__

The parties have inundated the Court with "undisputed" material facts, consisting of more than 220 paragraphs spanning more than 100 pages. The Court has endeavored to sift through the filings in order to determine the relevant facts. Construed in Plaintiff's favor and in roughly chronological order, the facts are as follows.

Plaintiff, a Caucasian male, was hired as a City of Clarksville police officer in August 2001. He attended the Tennessee Law Enforcement Training Academy for a period of eight weeks, ending in October or November 2001. Afterwards, Plaintiff undertook several phases of field training, with each phase lasting several weeks.

Plaintiff was first assigned to ride with Field Training Officer ("FTO") Scott Thompson. Plaintiff's performance was satisfactory, and he advanced to the next phase of field training.

During the second phase of field training from December 30, 2001 to February 2, 2002, Plaintiff was assigned to ride with Officer Jeff Stanfill ("Stanfill"), another FTO. During patrols, Stanfill allegedly made inappropriate comments about Korean women, racial comments about Lt. Tucker, an African-American, and gender-biased comments about female police officers. Stanfill also allegedly asked Plaintiff whether he had ever "sucked dick" or wanted to. Plaintiff told Stanfill his comments were offensive to him. The comments would become part of Plaintiff's first grievance.

Despite their differences, Stanfill passed Plaintiff on to the third and final part of field training. Plaintiff claims that during this period, he began experiencing harassment on the shift, to include foreign objects (sugar, ketchup and a chicken bone) being placed in his coffee. He also

2

claims that officers, including Stanfill and Sgt. Eric Gonzalez ("Gonzalez") made gestures with their wrists and hands which Plaintiff took to be a gesture for masturbation. Officers also allegedly ostracized Plaintiff.

Plaintiff began his last phase of training on February 3, 2002, and rode with FTO Mike Tanner ("Tanner"). He successfully completed this phase and began performing as a solo officer on or about March 4, 2002.

Upon being released to solo patrol, Plaintiff was assigned to a shift that included Gonzalez, Stanfill, Miller and Officer Nalley.[2] In April 2002, those officers met with Plaintiff and advised Plaintiff they believed his performance was not acceptable Plaintiff requested Lt. Vaden assign him to a different shift because he believed he was being harassed. Instead of being assigned to solo patrol on a different shift, Plaintiff was assigned to ride with FTO Derico for further evaluation and training.

On May 15, 2002, Plaintiff filed his first grievance (the "Stanfill grievance"). In that grievance Plaintiff alleged hazing and other inappropriate behavior. As background, Plaintiff included a recitation of the sexist, racist, and derogatory comments Stanfill allegedly had made when he was Plaintiff's FTO.

At some point after filing the Stanfill grievance, Plaintiff was advised by fellow Officer Thomas Johnson ("Johnson") to watch his back because death threats were allegedly being made against him by Stanfill. Stanfill purportedly said things like "this town is not big enough for both

---

[2]The statements of undisputed facts and the underlying documentation do not indicate the first names of some of the officers.

of us, and one of us will leave in a box," and "I don't have to get him, but my boys back home will take care of him."

Subsequently, Plaintiff was interrogated extensively by Lt. Ron Knight ("Knight"), head of Clarksville Police Department's Professional Integrity Unit. During the interview, Plaintiff was repeatedly asked whether he was planning to file a lawsuit against the Clarksville Police Department. Plaintiff perceived this to be intimidation and an effort to dissuade Plaintiff from taking legal action against the department.

In February 2003, Plaintiff submitted a letter to Police Chief Mark Smith ("Chief Smith") in which Plaintiff addressed several issues, including racism in the police department. Among other things, Plaintiff wrote:

> Considering what I may have personally heard, I do not find racism to play a part in the daily functions of our department. I do not see officers creating barriers between each other because of their personal differences. I have never heard such remarks stated to or in front of anyone in the public. I have never heard such remarks stated in the general work environment. Most importantly, on the department's behalf, I do not feel that racism plays a part in any of the promotional proceedings. This is not to say that I find this department to be entirely fare (sic) in all its proceedings but I do not see racism playing any significant role.

(Def. Ex. 26). Plaintiff indicated in the letter he was "not seeking a solution or action" and concludes by stating, "I find you to be a great Chief and leader and this goes without exception." (Id.).

At some point, Lt. Knight told Plaintiff that he was concerned that the letter would be placed in the Stanfill investigative file and that Plaintiff could withdraw the same and no one would know. Plaintiff claims that out of concern for further retaliation and harassment, he took the letter back on March 8, 2003.

4

Exactly what prompted the February 2003 letter is unclear, although Plaintiff claims that while on the shooting range in January 2003, he heard Sgt. Steve Poston ("Poston") call Officer Martin Hall ("Hall"), an African-American officer and civil rights litigant, a "nigger" and reported the same to Chief Smith. Plaintiff told Hall he had heard the comment and also relayed what he had heard to Officers Kenneth Austion ("Austion") and Tony Blakely ("Blakely"), both of whom were also involved in civil rights litigation against the police department.

In September 2003, Plaintiff stopped Jonathan Cunningham ("Cunningham"), a former Clarksville police officer, for driving 76 MPH in a 45 MPH zone. Plaintiff admits that during the stop he made some derogatory remarks about Stanfill.

On October 10, 2003, Cunningham purportedly told Officer Steffen that Plaintiff had given him a citation and then offered to pay to fix this citation in exchange for derogatory information about Stanfill. Officer Steffan filed an Internal Report and an internal investigation began into Cunningham's allegations.

On November 13, 2003, Plaintiff was interviewed by Lt. Knight and Detective Chancellor in relation to Cunningham's allegation. Plaintiff was again interviewed on February 10, 2004 and asked to write out a detailed statement concerning the incident, including details that he omitted from an earlier statement he had filed.[3]

The following day, February 11, 2004, Plaintiff filed a grievance alleging that the Cunningham investigation was being conducted in retaliation for the grievance Plaintiff filed in May 2002. Plaintiff also claimed that since filing his original grievance there were "threats against my life being made and overheard and then repeated to me in the form of a warning." (Def. Ex. 28).

---

[3]He was interviewed yet again by Lt. Knight and Detective Chancellor on February 18, 2004.

On February 17, 2004, Plaintiff filed his first charge of discrimination with the EEOC, alleging that he had been isolated from other white officers, had been threatened and insulted, and had been labeled a complainer and a whistle-blower. Plaintiff indicated the earliest date the discrimination took place was May 15, 2002. Plaintiff received a Notice of Suit Rights on March 22, 2004.

On February 25, 2004, Chief Smith authorized an investigation into Plaintiff's claims that his life had been threatened. The investigation revealed that Stanfill had allegedly made a threatening statement about Plaintiff within a month or two after Stanfill was disciplined for the original grievance filed by Plaintiff in May 2002. The investigation also revealed that the majority of officers believed that pranks and rude remarks were part of the hazing process during field training. (Def. Exs. 29 & 30).

Plaintiff claims that on May 5, 2004, he met with Lt. Carney and was told that Chief Smith, Deputy Chief Bob Davis, Lt. Knight and Detective Chancellor were looking to terminate Plaintiff. Lt. Carney further told Plaintiff that he felt the police did not take care of Plaintiff in the beginning. Lt. Carney explained that the police department liked letters of apology and handed Plaintiff a prepared apology letter which he suggested Plaintiff submit. Plaintiff declined and believed he was being set up to be fired.

Five days later, on May 10, 2004, Plaintiff had another meeting with Lt. Carney who reiterated that Chief Smith, Deputy Chief Davis, Lt. Knight and Det. Chancellor wanted to fire him. Once again, Carney offered him a prepared apology letter, and advised him to submit the same. Again, Plaintiff declined.

6

On May 11, 2004, Plaintiff had a pre-decision hearing with Chief Smith, Deputy Chief Davis, Lt. Carney and Lt. Knight in relation to the Cunningham stop. During the meeting, Lt. Carney told Plaintiff that he was afraid Plaintiff "was taking some bad advice, from some bad people." Plaintiff took this to mean the African American officers (Austion, Blakely, and Hall) who were then involved in civil rights litigation with the police department. (Hisel Aff. ¶ 57). Lt. Carney further told Plaintiff that "as long as you continue to take their advice, you might as well carry a shovel around in [your] back pocket and pull the dirt in on top of [you]." (Id. ¶ 58).

The following day, Plaintiff was taken off work by his physician due to work-related stress. Four days later, he was contacted by Deputy Chief Davis and told to turn in his patrol car. Davis directed the clerk to provide Plaintiff with a high mileage car since "it did not matter because he [Plaintiff] would not be with the CPD much longer."

Chief Smith was provided with the findings of the investigation into Plaintiff's dealing with Cunningham on April 6, 2004. Thereafter, on June 24, 2004, Chief Smith provided Plaintiff with a Memorandum outlining the conclusions relating to the Cunningham investigation. Chief Smith instructed Plaintiff to spend four 12-hour shifts with four different road sergeants to ensure he was current on all aspects of police work and assigned him to a patrol shift so that he could be more closely supervised for a period of one year. Chief Smith also recommended Plaintiff be suspended for 72 hours, with 24 hours to be served immediately and the remainder to be held in abeyance and set aside upon the successful completion of the additional training. Plaintiff attempted to appeal the discipline on July 1, 2004, even though he had been advised that it involved nonappealable issues under department policy.

On July 13, 2004, Plaintiff filed his second charge of discrimination with the EEOC, alleging that he was disciplined shortly after filing his February 17, 2004 EEOC charge, and that the discipline was in retaliation for that charge. Plaintiff further claimed that he was being denied his right to appeal the extra-training requirement. Plaintiff listed the first date of discrimination as March 1, 2004. Plaintiff claims that shortly after filing the second charge Lt. Knight tried to intimidate him by interviewing him about the charge.[4]

On September 18, 2004, someone fired a shot into a home, owned by Plaintiff, where his mother-in-law and brother-in-law resided. This was less than a week after Plaintiff had been informed by Lt. Knight that Stanfill had requested and received access to Plaintiff's personnel file which contained an address for the home. Plaintiff immediately went to the residence. His mother-in-law originally suspected her ex-husband was the shooter.

At Plaintiff's request, the investigation into the shooting was turned over to the Tennessee Bureau of Investigations ("TBI"). Plaintiff allegedly identified several Clarksville police officers, including Officer Nalley, as possible suspects. The TBI took the service weapons and personal .40 caliber weapons of several Clarksville police officers for ballistic tests. Among the weapons taken for comparison where those owned by Austion, Blakely and Hall.

Three days after the investigation began, it was initially closed. Several months later, Officer Nalley was assigned to investigate the shooting.

---

[4] Plaintiff was issued a Notice of Suit Rights with regard to this charge on July 15, 2004.

On January 7, 2005, Plaintiff approached Chief Smith to discuss the investigation into the shooting.[5]  Plaintiff claims Chief Smith became agitated with him in the meeting and made comments like "you're ridiculous" and "you're a piece of work."  After the meeting, Plaintiff went to Human Resources to discuss Chief Smith's conduct with the Human Resources Director, Mike Worsham ("Worsham").  Later that same day, Plaintiff filed a grievance complaining that Chief Smith's "attitude and demeanor was inconsiderate, abusive, and offensive."

On July 27, 2005, Plaintiff filed a grievance complaining that he did not receive his July 1, 2005 step increase.  Plaintiff noted "I will expect to receive a response to this grievance within 5 working days."  On September 9, 2005, Plaintiff was advised by Worsham that Plaintiff's normal step increase was unintentionally omitted as a result of an administrative misunderstanding in Worsham's office and that "it was never the Chief of Police's intention to deny or delay your step increase." (Def. Ex. 38).  Worsham assured Plaintiff he would receive the correct amount of back pay to offset the difference in pay.

On August 10, 2005, Plaintiff testified in the trial of <u>Blakely v. City of Clarksville</u> in this court.  Plaintiff also testified in the trials of <u>Austion v. City of Clarksville</u> in April 2005 and <u>Hall v. City of Clarksville</u> in March 2006.

On January 10, 2006, Plaintiff filed a grievance concerning information placed in his personnel file which questioned his sexual preference.   That information appeared after the investigation into Plaintiff's claim that he had been threatened.  During the investigation, eighteen officers were interviewed, one of whom made comments about Plaintiff's alleged sexual preference.

---

[5]There is no proof that any Clarksville police officer was involved in the shooting into the house owned by Plaintiff.

By Memorandum, dated January 30, 2006, Plaintiff was advised that the information he complained of had been redacted and Plaintiff was provided with a copy of his redacted personnel file.

In March 2006, Plaintiff took the written examination for a Child Advocacy Detective position that was posted on January 27, 2006.  He then sat for an oral interview with the command staff in late March or early April 2006.   On April 7, 2006, Plaintiff received three (3) letters in his departmental mailbox, including a letter stating he had not been selected for the position, a second which indicated he would remain on the list to be considered for a second detective slot, and a third which indicated that he would remain on the detectives list for sixth months.  .

On April 13, 2006, Plaintiff filed his third EEOC charge alleging that he was discriminated against when he was not selected to become a Child Advocacy Detective.    Three days after filing the charge, Plaintiff filed a grievance regarding the Child Advocacy Detective vacancy.  As a part of this grievance, Plaintiff complained about the composition of the promotion board because it included Deputy Chief Bob Davis who purportedly had told Plaintiff "he was blowing smoke" and was the officer who had told the clerk to give Plaintiff the high mileage car.  Plaintiff also did not like the composition of the board since it included Lt. Knight, whom Plaintiff had previously complained about.  (Def. Ex. 10).  Plaintiff noted in the grievance that  "the only thing I find to be fair, firm or consistent about this procedure is the act of discrimination, retaliation and a continuos [sic] violation of my Civil Rights."  (Id.)  That same day he  also filed a grievance claiming that he should be compensated for the time spent in litigation, even though he acknowledged that issues regarding pay are not grievable.

The next day, April 17, 2006, Plaintiff was verbally reprimanded and a warning was placed in his file after he was observed speeding and switching lanes unsafely.   Two days later he grieved

the reprimand claiming it was in retaliation for past complaints. On May 8, 2006, Plaintiff was informed the warning was being removed from his personnel file.

On April 19, 2006, Cpt. Gray discussed with Plaintiff the two grievances he had filed on April 16, 2006, that is, the grievance about being compensated for time spent in litigation and the grievance about the Child Advocacy Detective position. This led to Plaintiff filing a Grievance complaining that Cpt. Gray inadequately responded to Plaintiff's two April 16, 2006 grievances, and further complaining that Gray discussed this matter in person with Plaintiff. Plaintiff noted: "I did not ask for anyone's personal opinion. I did not ask how anyone felt about my issues. If I file a grievance I expect and deserve a fair and straight response." (Def. Ex. 12). Chief Smith responded to this grievance by noting that Cpt. Gray did nothing improper by discussing work related matters with Plaintiff.

On April 24, 2006 Plaintiff filed a Grievance alleging that "Chief Smith has wrongfully not paid due attention to my grievances." (Def. Ex. 16). This was followed by a May 2, 2006, Grievance in which Plaintiff complained that Chief Smith did not adequately respond to Plaintiff's April 16, 2006 Child Advocacy grievance.

In a Memo dated May 19, 2006, Worsham advised Plaintiff that both of his April 16, 2006 Grievances were unfounded.[6] Thereafter, on July 7, 2006, Plaintiff filed a grievance questioning whether he would be required to take a written test for the Child Advocacy position that had become open.

---

[6]The Court notes Plaintiff claims he filed his fourth EEOC charge on May 9, 2006. However, there is no proof of that in the record and apparently, even though the parties have exchanged voluminous documents, Defendant has not been provided with a copy of this charge.

On July 30, 2006, Plaintiff filed yet another grievance stating: "the purpose of this grievance is to inform you that I am still on the list for Detective, effective until October 6, 2006. (Def. Ex. 17). Chief Smith provided a response to Plaintiff's grievance by Memo dated August 4, 2006, but ten days later, August 14, 2006, Plaintiff filed a grievance complaining that Chief Smith had not properly responded to Plaintiff's July 30, 2006 grievance.

Plaintiff filed his initial Complaint on October 13, 2004 and an Amended Complaint on April 3, 2006. In his Amended Complaint, Plaintiff asserts that the Defendant violated Title VII, 42 U.S.C. § 2000e and the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.* by retaliating against him and by allowing a hostile work environment to exist. He also alleges state law causes of action, including malicious harassment, negligent infliction of emotional distress, and outrageous conduct.

All totaled, Plaintiff filed three EEOC charges – on February 17, 2004, July 13, 2004 and April 13, 2006. Interspersed among the charges are at least fifteen grievances, the bulk of which post-date the filing of Plaintiff's original complaint.

## II. <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. <u>See</u> <u>Anderson</u>

v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  ANALYSIS

Defendant has moved for summary judgment with respect to all of Plaintiff's claims.[7] Defendant asserts both substantive and procedural reasons for dismissal.

### A.      The February 2004 Charge Will Be Dismissed

In his first charge with the EEOC filed  February 17, 2004, Plaintiff claimed harassment and intimidation on the job as a result of his having reported racial slurs and sexually inappropriate comments in May 2002.  This, he claims, resulted in threats, insults and  isolation from others, and his labeling as a complainer and whistle-blower.   Defendants claim this charge is untimely.

---

[7]As indicated, Plaintiff brings claims under Title VII and the THRA.  Those claims are subject to the same analytical framework.  Gee-Thomas v. Cingular Wireless, 324 F.Supp.2d 875, 881 (M.D. Tenn. 2004)("analysis of claims under the THRA is the same as under Title VII").

13

Prior to filing suit under Title VII, a plaintiff must receive a right-to-sue letter from the EEOC and then file suit within ninety days of receipt of that letter. 42 U.S.C. § 2000e-5(f)(1). The ninety-day requirement for filing suit is not jurisdictional and the time limit may be tolled where an employee is actively misled into foregoing the right to file suit, Harris v. Giant Eagle, Inc., 133 Fed. Appx. 288, 292 n.1 (6th Cir. 2005), or where "despite all due diligence [Plaintiff] is unable to obtain vital information bearing on the existence of his charge." EEOC v. Kentucky State Police, 80 F.3d 1086, 1095 (6th Cir. 1996). Further, while not jurisdictional, "the time limit to file a Title VII action . . . is still a condition precedent to filing suit in federal court" and any basis for tolling the period must be compelling. Page v. Metropolitan Sewer Dist. of Louisville, 84 Fed. Appx. 583, 585 (6th Cir. 2003).

With regard to the February 17, 2004 charge, Plaintiff received a Dismissal and Notice of Suit Rights on March 22, 2004. However, his Complaint was not filed until October 13, 2004, long after the ninety-day period had expired. Plaintiff has not presented any evidence that equitable reasons exist to excuse his failure to comply with the prerequisites for filing suit in relation to the February 17, 2004 charge, and hence the claims underlying this charge are subject to dismissal.

In an effort to save this charge, Plaintiff asserts that he is alleging a continuing violation in the form of a hostile work environment. Therefore, he claims his February 17, 2004 charge is viable.

In National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) the Supreme Court held Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." Id. at 105. That is, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 113. Instead,

14

"[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." Id. The Court also held that "all acts comprising a hostile work environment claim, including those that would otherwise fall outside the filing period, are timely so long as at least one act comes within Title VII's filing window." Sasse v. U.S. Dept. of Labor, 409 F.3d 773, 782 (6th Cir. 2005). Thus, "in Morgan, the Supreme Court emphasized the inapplicability of the continuing-violation doctrine to discrete acts of discrimination, even those that are related to one another, apart from hostile environment claims." Dendinger v. State of Ohio, 2006 WL 3311284 at *4 (6th Cir. 2006).

Plaintiff's continuing violation argument presupposes the existence of a viable hostile work environment claim. As will be explained in section D *infra,* Plaintiff has no viable hostile work environment claim and accordingly, his February 17, 2004 charge is time-barred.

**B.**      **The April 13, 2006 EEOC Charge Will Not Be Dismissed**

Prior to filing suit in federal court, a Title VII claimant must first present his or her charges to the EEOC. "The purpose of filing a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC so that the Commission may first attempt to obtain voluntary compliance with the law." Davis v. Soexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998). "These investigatory and conciliatory procedures notify potential defendants of the nature of plaintiffs' claims and provide them the opportunity to settle the claims before the EEOC rather than litigate them." Id.

"Because the aim of the statutory scheme is to resolve disputes by informal conciliation, prior to litigation, suits in the district court are limited to matters of which the EEOC had notice and chance, if appropriate, to settle." Anjelino v. New York Times Co., 200 F.3d 73, 93 (3d Cir. 1999).

Therefore, a "complainant may not bring a Title VII suit without having first received a right-to-sue letter." Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 469-472 (3d Cir. 2001).

Defendant claims that this Court has no jurisdiction over Plaintiff's April 13, 2006 EEOC charge because Plaintiff has yet to receive a right to sue letter in relation to this charge. Under governing Sixth Circuit law, the Court must disagree.

Retaliation claims are excepted from the EEOC filing and receipt of right to sue letter requirements insofar as they arise after the filing of a charge. Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 254 (6th Cir. 1998); Ang v. Procter & Gamble Co., 932 F.2d 540, 544-45 (6th Cir. 1991). This is because retaliation claims often arise after the filing of an initial EEOC charge and allowing the litigant to proceed without a separate right to sue letter "is properly grounded in the belief that the inability of the parties to solve the original complaint is likely to make future complaints futile." Rennie v. Garrett, 896 F.2d 1035, 1062 (7th Cir. 1990).

In this case, Plaintiff had already twice-complained (on February 17, 2004 and July 13, 2004) about mistreatment to the EEOC when he filed his April 13, 2006 charge, and the claims in the last charge grew out of the prior charges. Accordingly, the April 13, 2006 charge will not be dismissed.

C.      **Plaintiff's Discrimination Claim Will Be Dismissed**

Title VII prohibits discrimination in employment on the basis of race, sex, national origin or religion. 42 U.S.C. § 2000e-2. It also prohibits retaliation based upon an employee's opposition to practices made unlawful under the statute. 42 U.S.C. § 2000e-3.

In this case Plaintiff at points appears to meld his retaliation claims together with purported claims for discrimination. That is, in discussing what he purports to be discrimination, Plaintiff utilizes the standards and elements used for analysis of a retaliation claim. Elsewhere, however, he

16

points out that "[i]t is discriminatory and violative of Title VII and the THRA to retaliate against an individual who participates in protected activities, and/or subject one to a hostile work environment." (Docket Entry No. 67 at 32).

Insofar as Plaintiff may be attempting to assert claims for discrimination (as opposed to retaliation), the same must be dismissed. "Retaliation is a separate violation of Title VII." Gupta v. Florida Bd. or Regents, 212 F.3d 571, 586 (11th Cir. 2000). It is a derivative claim, distinct, and "motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice." Noviello v. City of Boston, 398 F.3d 76, 87 (1st Cir. 2005); see, O'Hara v. Memorial Sloan-Kettering Cancer Ctr., 27 Fed. Appx. 69, 70 (2d Cir. 2001) ("retaliation is a theory of liability that is substantively distinct from" a discrimination claim).

The Court finds no basis for a discrimination claim, as opposed to a claim for retaliation in this case. There is no evidence Plaintiff was treated differently because of his race, only evidence from which a jury could find he was retaliated against for engaging in protected activity.[8] Thus, to the extent that Plaintiff may be asserting a claim of discrimination as opposed to a claim for retaliation, such a claim will be dismissed.

## D. **Plaintiff's Hostile Work Environment Claim Will Be Dismissed**

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc.,

---

[8]In his April 13, 2006 charge with the EEOC, Plaintiff checked the box for race discrimination (and retaliation) but he has presented no evidence that, because of his race, he failed to receive a promotion or was disciplined differently than others outside of his race as is necessary to establish a *prima facie* case.

17

510 U.S. 17, 21 (1993). "In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subject to unwelcome harassment, 3) the harassment was based on the employee's race, 4) the harassment affected a term, condition, or privilege of employment and 5) the employer failed to take reasonable care to prevent and correct any harassing behavior." Moore v. KUKA Welding Systems, 171 F.3d 1073, 1078-79 (6th Cir. 1999).[9]

Contrary to Plaintiff's suggestion that the alleged harassment was race-based, there is no evidence before the Court which would suggest Plaintiff was harassed because of his race. Instead, the only conclusion which the record supports is that Plaintiff may have been retaliated against for engaging in protected activity. See, Schramm v. Slater, 105 Fed. Appx. 34, 40 (6th Cir. 2004) ("Disparate treatment and hostile work environment arguments both allege violation of Title VII rights. However, a disparate treatment argument is analytically distinct from a hostile work environment argument"). While Plaintiff may have a valid claim for retaliation, he has no claim for a hostile work environment because of his race. See, Baugham v. Battered Women, Inc., 2006 WL 3780295 at *5 (6th Cir. 2006)("As with all harassment, same-sex harassment must be 'because of sex' to be actionable under Title VII" and "Plaintiffs must show that but for their gender they would not have been harassed"); Bowman, 220 F.3d at 464 ("We agree with the district court that while [Plaintiff] recites a litany of perceived slights and abuses, many of the alleged harassing acts cannot

_____

[9]To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000).

18

be considered in the hostile environment analysis because [Plaintiff] has not shown that the alleged harassment was based upon his status as a male"); Dick v. Phone Directories Company, Inc., 397 F.3d 1256, 1263 (10th Cir. 2005)("If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment" and cannot establish a sexually hostile work environment claim); Long v. Ford Motor Co., 2005 WL 1966315 at *12 (N.D. Ohio 2005)("in order to demonstrate a hostile work environment, plaintiff must demonstrate that the harassment was based on race, not on his position as a union representative").

Plaintiff cites Wheaton v. North Oakland Med. Ctr., 130 Fed. Appx. 773 (6th Cir. 2005), and Johnson v. Univ. of Cincinnati, 215 F.3d 561 (6th Cir. 2000) for the proposition that "[t]he Sixth Circuit has recognized Title VII hostile work environments predicated upon reverse discrimination." (Docket Entry No. 67 at 36). While Wheaton mentioned "reverse-discrimination hostile work environment," Johnson did not. In any event, both cases are inapposite.

In Johnson, the Sixth Circuit was presented with a claim brought by a university vice-president alleging race and national origin discrimination, as well as retaliation. His claim was not that he was subjected to a hostile work environment, but rather that he was terminated and that his termination was the result of his advocacy on behalf of women and minorities. The viability of a hostile work environment claim brought by one who had participated in an EEOC proceeding, based upon his participation in such a proceeding, simply was not addressed by the court.

Wheaton involved review of a jury verdict in favor of a white female employee who was married to an African-American male and who had a bi-racial daughter. On appeal, the employer contended that the evidence was insufficient to support a hostile work environment claim. In

rejecting the argument and finding sufficient evidence to support an award of damages for a hostile work environment, the Sixth Circuit observed that plaintiff "received numerous threatening notes and an offensive email addressed to her personally, all of which repeatedly referenced her race and her relationship with a black man," and "there were at least two altercations with African-American co-workers, during which racial epithets were directed to" plaintiff.  <u>Wheaton</u>, 130 Fed Appx. at 791.  Clearly, the hostile work environment in <u>Wheaton</u> related to race, even if the plaintiff in that case was white.

Here, to the contrary, Plaintiff has not presented evidence to generate a genuine issue of fact for trial that the litany of matters about which he complains had anything to do with his race. Complaints about improper investigations, wrongful transfers, failures to promote, failures to provide step increases, failure to pay comp time, and the like do not suggest that Plaintiff was discriminated against in the work place because of his race or that the actions taken against him at work because he was white were severe and pervasive conduct so as to support a hostile work environment claim.

In reaching this conclusion, the Court recognizes that the episode involving the shooting into the home owned by Plaintiff can be viewed differently.  However, there has been no evidence presented that Clarksville police officers were involved in the shooting and therefore nothing linking it to the Defendant.  Further, the allegations Plaintiff makes about officers bending their wrists and hands (which Plaintiff took to be a sign for masturbation) and the one officer's statement that he believed Plaintiff to be a homosexual (which thereafter was placed in Plaintiff's personnel file) could be seen to support a claim of hostile work environment based on sex.  However, these incidents were isolated and not pervasive or severe.

20

In light of the foregoing analysis, Plaintiff's hostile work environment claim will be dismissed. Having made that determination, however, the Court notes that the evidence upon which Plaintiff relies, while not supportive of a claim for a hostile work environment, may be used as an alternative method to show retaliation. That is, Plaintiff may present evidence of retaliation and an adverse employment action, or show retaliatory harassment to meet the requirement that he was subjected to an adverse employment action. See, Morris v. Oldham County Fiscal Court, 201 F.3d 784, 793 (6th Cir. 2000)(modifying third and fourth elements of a retaliation claim by indicating that to prove retaliation an employee may show he was subjected to an adverse employment action or "severe or persuasive retaliatory harassment by a supervisor").

**E.  Plaintiff's Retaliation Claims Based Upon His July 13, 2004 and April 13, 2006 Charges Will Not Be Dismissed**

Plaintiff's July 13, 2004 charge alleges a continuing violation and that he was subjected to retaliation in regard to his original EEOC charge on February 17, 2004, as well as his transfer and discipline as a result of the Cunningham investigation. His third EEOC charge on April 13, 2006 alleges that he was denied the Child Advocacy Detective position based upon discrimination. For a host of reasons, Defendant seeks to dismiss or at least limit Plaintiff's claims of retaliation.

Defendant asserts that Plaintiff's retaliation claims should be limited to the specifics of the charges, i.e. whether he was retaliated against in relation to the Cunningham investigation or the denial of the Child Advocacy Detective position. The law does not support such a narrow reading of the charge.

In addition to charges contained on the face of an EEOC charge, " courts will also review any additional claims that 'can reasonably be expected to grow out of the EEOC charge.'" Young v. Daimler Chrysler Corp., 52 Fed. Appx. 637, 639 (6th Cir. 2002)(citation omitted). "For a charge

21

to grow out of an ensuing investigation, the plaintiff's EEOC charge must, at a minimum, relate *facts* that would prompt the EEOC to consider or investigate other forms of discrimination." Id. (emphasis in original). Hence, "a judicial complaint must be limited to 'the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination,' [and] not . . . tied to the four corners of the one-page form document under all circumstances." Duggins v. Steak 'N Shake, Inc., 195 F.3d 828, 832 (6th Cir. 1999)(quoting Ang v. Procter & Gamble Co., 932 F.3d 540, 545 (6th Cir. 1991)).

In this case, Plaintiff alleged in his EEOC charges that he was subjected to continuing retaliation because he reported racial slurs directed at black police officers, threats, insults, and sexually inappropriate comments. Later he alleges retaliation because he filed additional EEOC charges and testified at trials in support of black Clarksville police officers who were pursuing racial discrimination complaints. The retaliation about which he complains (and which serves as the basis for his grievances) naturally grows out of the original charges of discrimination he filed against the Defendant..

Defendant also asserts Plaintiff cannot establish a prima facie case of retaliation[10] because he can show no causal connection between the events about which he complains and his protected activity. That is, Defendant asserts Plaintiff "relies on 'temporal proximity' alone to support his claims" and "this is insufficient." (Docket Entry No. 73 at 7).

---

[10]To establish retaliation under Title VII, a plaintiff must show (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action and (3) that the adverse action occurred because of the protected activity. Canitia v. Yellow Freight System, Inc., 903 F.2d 1064, 1066 (6th Cir. 1990).

It is true, as Defendant points out, that "the mere fact that an adverse employment action occurs subsequent to the protected activity does not, standing alone, support a finding of retaliation," Jeffries v. Wal-Mart Stores, Inc., 15 Fed. Appx. 252, 254 (6th Cir. 2001). However, the evidence, construed in Plaintiff's favor, suggests that after his initial grievance filed against Officer Stanfill on May 15, 2002 because of Stanfill's harassment and inappropriate racial and sexist comments, Plaintiff was repeatedly subjected to treatment different than his co-employees. When viewed as a whole, the evidence presented by Plaintiff is sufficient to present a jury question as to whether he was retaliated against for engaging in protected activity. See, Little v. BP Exploration & Oil Co., 265 F.3d 357, 365 (6th Cir. 2001)("a reasonable jury could infer that Plaintiff's filing of the EEOC complaint prompted Defendant to discipline Plaintiff for conduct which might not normally warrant disciplinary action, or at least to the extent of the disciplinary action Plaintiff suffered"); Moore., 171 F.3d at 1080 (holding that the close proximity in time between the adverse action and the protected activity coupled with the evidence of frequent discipline for trivial matters and unwarranted criticism of the plaintiff's work, when viewed as a whole, supported the jury's finding of retaliation); Harrison v. Metropolitan Gov't of Nashville, 80 F.3d 1107, 1118 (6th Cir. 1996)(prima facie case of retaliation established where "study of the record in this case reveals an atmosphere in which the plaintiff's activities were scrutinized more carefully than those of comparably situated employees, both black and white, and that the defendants took every opportunity to make his life as an employee unpleasant").

Defendant next argues that in relation to some of the specific incidents about which Plaintiff complains, it has presented legitimate non-discriminatory reasons for its actions which Plaintiff cannot show to be pretextual. While that may be so, the Court's concern presently is with the big

picture and whether Plaintiff can show that he was subjected to retaliation for having engaged in protected activity. As stated by the Sixth Circuit:

> This case involves the protection of an employee's right to assert claims against his employer without fear of retaliation. It is thus of utmost importance that this court carefully consider the totality of the facts in the record when evaluating claims of retaliation. We find that the district court failed to do this.

Carrasco v. NOAMTC, Inc., 124 Fed. Appx. 297, 204-05 (6th Cir. 2004). As another circuit has observed:

> We cannot presume that fact finders view each piece of evidence in isolation, and most cases that involve claims of retaliation stem from rich factual backgrounds that provide ample evidence to support and/or disprove allegations of retaliation. In all such cases, the evidence of pretext and retaliatory intent must be viewed in its totality.

Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1122 (8th Cir. 2006). See also, Paz v. Wauconda Healthcare and Rehabilitation Ctr., LLC, 464 F.3d 659, 666 (7th Cir. 2006)("At summary judgment, a district court cannot view the record in small pieces that are mutually exclusive of each other"); Moore, 171 F.3d 1073 at 1080 ("Other incidents that occurred after plaintiff filed the EEOC complaint were related to the jury by plaintiff and others . . . including more frequent disciplinary writeups of plaintiff for trivial matters and unwarranted criticism of plaintiff's work. When viewed as a whole these separate incidents support the jury's finding that defendants retaliated against plaintiff").

In this case, the evidence construed in Plaintiff's favor paints a mosaic which raises a suggestion that he was retaliated against because he engaged in protected activity. Whether in fact that is what occurred will be for the jury to decide. There are genuine issues of fact which must be decided. Therefore, summary judgment is inappropriate and the jury will determine the merit of Plaintiff's retaliation claims.

**G.**     **Plaintiff's State Law Tort Claims Will Be Dismissed**

Plaintiff alleges that Defendant's actions constituted the torts of negligent infliction of emotional distress, malicious harassment, and outrageous conduct. Defendant moves to dismiss these claims on the ground that it is immune from liability for such claims and further on the grounds that Plaintiff cannot establish such claims as a matter of law.

The Tennessee Government Tort Liability Act ("TGTLA") partially waives immunity which had previously been afforded governmental agencies in Tennessee. Specifically, the TGTLA removes immunity "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment." T.C.A. § 29-20-101. However, the act specifically preserves immunity from claims arising out of "false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights." T.C.A. § 29-20-205(2). Hence, "[u]nder GTLA, the City is generally subject to suit for civil claims sounding in negligence unless the negligence claims 'arise out' of the exceptions provided in Tenn. Code. Ann. § 29-20-205." Rhodes v. City of Chattanooga, 2005 WL 2647921 at * 8 (E.D. Tenn. 2005).

In Hale v. Randolph, 2004 WL 1854179 (E.D. Tenn. 2004), the court observed it was "fair and reasonable to interpret the plain language in § 29-20-205(2) as meaning that civil rights claims are a type of intentional tort" and that such claims "include those arising under the federal civil rights laws," even where a plaintiff seeks to circumvent or avoid the City's immunity from suit . . . by couching some of his civil rights claims against the City in the guise of negligence *per se*." Id. at * 17. Similarly, and based on Hale, the court in Willis v. Neal, 2006 WL 270288 (E.D. Tenn.

25

2006), vacated on other grounds, 2006 WL 1129388 (E.D. Tenn. 2006) held that "[b]ecause plaintiff asserts her state law claims in the context of a civil rights case, her alleged injuries arise out of 'civil rights' and the governmental entities are entitled to immunity under the TGTLA." Id. at 17. Combined, these cases can be read to support Defendant's assertion that it is entitled to immunity, at least with respect to Plaintiff's state law claims for the negligent infliction of emotional distress and outrageous conduct.[11]

Regardless of whether Defendant is entitled to immunity, it is clear that Plaintiff cannot prevail on his state law tort claims. Plaintiff "concedes that the GTLA bars his claim for negligent infliction of emotional distress, and therefore waives the same." (Docket Entry No. 67 at 37). Accordingly, this claim will be dismissed.

Plaintiff's claim for malicious harassment is also subject to dismissal. Civil malicious harassment claims are based upon Tennessee's criminal malicious harassment statute. T.C.A. § 39-17-309. It is "an 'ethnic intimidation' or 'hate crimes' statute," Surber v. Cannon, 2001 120735 at *5 and as such, the harassing conduct must arise because of the person's race, color, ancestry, religion or national origin." Id at *6; accord, Davis v. Tennessee Wildlife Resources Agency, 2006 WL 861352 at *5 (Tenn. Ct. App. 2006). Here, Plaintiff is Caucasian and there is no suggestion that the harassment about which he complains was based on his race.

Finally, Plaintiff's claim for outrageous conduct will be dismissed. The tort of outrageous conduct in Tennessee exists only where (1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as

---

[11]In light of Washington v. Robertson County, 29 S.W.3d 466 (Tenn. 2000) the City would not be entitled to immunity on Plaintiff's malicious harassment claim.

atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury. Swallows v. Western Elec. Co., 543 S.W.2d 581, 582-83 (Tenn. Ct. 1976). "Generally, 'the case involves facts which would arouse the resentment of an average member of the community and lead him to exclaim, "Outrageous!" Sayer v. Memphis Educ. Ass'n, 2006 WL 3298326 at *6 (Tenn. Ct. App. 2006) quoting, Chandler v. Prudential Ins. Co., 715 S.W.2d 615, 622 (Tenn. Ct. App. 1986). Hence, it is not sufficient that a defendant "has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).

Cases finding outrageous conduct include a mother being shown her deceased baby preserved in formaldehyde in a jar, Johnson v. Woman's Hospital, 527 S.W.2d 133 (Tenn. Ct. App. 1975), a mother being erroneously informed her daughter's death was the result of sexual assault and suffocation, Dunbar v. Strimas, 632 S.W.2d 558 (Tenn. Ct. App. 1981), and a photo store employee informing a woman that her film could not be developed when in fact the employee kept the nude photographs and showed them to acquaintances of the customer, Dunn v. MotoPhoto, Inc., 828 S.W.2d 747 (Tenn. Ct. App.1991). The facts alleged by Plaintiff, even if true, do not rise to this level or constitute such extreme, outrageous conduct which would be beyond the pale of decency. Accordingly, the outrageous conduct claim will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Docket Entry No. 59) will be granted in part and denied in part. It will be granted with respect to Plaintiff's (i) February 17, 2004 EEOC charge; (ii) discrimination claim; (iii) hostile work environment claim; (iv) claim for malicious harassment; (v) outrageous conduct claim, and (vi) claim for the negligent

inflection of emotional distress.  The Motion for Summary Judgment will be denied with respect to Plaintiff's retaliation claims based on his July 13, 2004 and April 13, 2006 EEOC charges.  In light of these rulings, the Motions in Limine (Docket Entry Nos. 76, 78, 79 & 97) will be stricken.  However, the parties will be permitted to re-file Motions in Limine which take into account these rulings on the Motion for Summary Judgment.

Further, Defendant's Motion to Allow Filing Supplemental Affidavit of Richard Stadler (Docket Entry No. 75) will be granted.    Finally, Plaintiff's Motion to Allow Supplemental Responses to Statement of Undisputed Facts (Docket Entry No. 80) will be granted.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE